# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,   )<br>  )<br>   Plaintiff,   )<br>  )<br>vs.   )<br>  )<br>JEREMIAH EZELL,   )<br>  )<br>   Defendant.   ) | 8:09CR137<br><br>REPORT AND<br>RECOMMENDATION |

This matter is before the court on the defendant's Motion to Suppress (Doc. 19). An evidentiary hearing was held on June 25, 2009. The transcript of the hearing (Doc. 34) was filed on July 22, 2009, at which time the motion was deemed submitted.

The defendant moves the court for an order suppressing his custodial statements to law enforcement officers on February 25, 2009 and April 21, 2009 and suppressing the physical evidence (a DNA swab) given to officers on April 21, 2009. Defendant alleges the statements were made while he was in custody, he was not advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), the statements were obtained in violation of U.S. Const. amend. 5 and *Edwards v. Arizona*, 451 U.S. 477 (1981), and the physical evidence obtained thereafter was a fruit of this violation.

The government argues that the public safety exception to *Miranda*, *see New York v. Quarles*, 467 U.S. 649, 657 (1984), applies in this instance.

## I.  FACTUAL BACKGROUND

Omaha Police Sergeant Pamela Volk testified that she was on duty on February 25, 2009 at approximately 4:45 PM, in uniform and driving a marked police cruiser when she received a radio broadcast regarding a stolen silver or gray Honda pickup.  The theft victim, Mark Neumeier, had identified the vehicle on the roadway and was following it.  The dispatcher gave the vehicle's license plate number and reported that the Mr. Neumeier lost the vehicle northbound on 51st Street from L Street.

Sergeant Volk, who was patrolling in the area, spoke with Mr. Neumeier, who told her there was a handgun in the truck when the truck was stolen from him.  Neumeier did not tell her where in the vehicle the handgun would be located.  Volk broadcast that information over the radio.  She subsequently observed the pickup truck parked in the driveway of 4542 South 61st Street.  She testified that she and officers on her crew had been dispatched to that address at least three times to investigate domestic disturbances.

Volk testified that she notified other officers who were in the area and told the dispatcher they "had a vehicle."  Volk, Officer Sykes and Officer Russell approached the residence.  The officers cleared the Honda pickup before they passed it, to make sure there were no suspects in the vehicle and that it would be safe to be standing in front the pickup before they checked the house.  The officers found a silver handgun in the center console. Volk testified on cross-examination that she did not take the time to verify that the silver handgun was specifically the handgun that Neumeier reported missing.

After the Honda pickup was cleared, the occupant of 4542 South 61st Street, Carmaletta Fowler, came outside to ask what was going on. Ms. Fowler said that her niece, her 7-year-old son, and her niece's male friend were in the house. Fowler told Volk that the niece's friend had brought the truck there in the last few minutes.

Sergeant Volk testified that she asked Carmaletta Fowler for permission to enter the residence to check for the suspect, and Fowler gave her permission to do so. Volk and four other officers split into two teams to clear the residence. Officers Sykes and Russell found the defendant, Jeremiah Ezell, seated on the couch upstairs. The niece and the 7-year-old child were located in the basement.

Sergeant Volk spoke with the defendant before he was removed from the residence. He told her he did not live at the address of 4542 South 61st Street, had walked to the residence, and did not know why the officers were there. The officers placed Ezell in handcuffs and escorted him from the house.

As they left the residence, they encountered Mr. Neumeier, who was standing outside the house. Neumeier pointed to Ezell and said that was the man who was driving his truck. Ezell was already in custody due to information given by Carmaletta Fowler and because he matched the physical description previously provided by Neumeier. Volk told Ezell he was under arrest for the stolen vehicle. She handed him off to Officers Hutton and Rader to conduct a pat down search. The officers did not find anything of interest during the pat down search.

At this point, everybody was outside the residence standing in the driveway. Sergeant Volk asked Ezell whether the people in the house were his friends, and defendant said they were. She then asked Ezell whether there was anything in the house that could harm anybody or get them in trouble. Ezell did not respond. Volk then asked him whether there was a bunch of dope in the house. Ezell said there was not, but told her there were some guns in the house that he had taken in from the truck. She asked defendant if he had driven the truck there, and he replied, "yes." Although Volk did not specifically ask him about where the guns were, defendant told her there was a handgun under the cushion of a chair near where he had been sitting, and that there were two guns in the closet upstairs.

Sergeant Volk acknowledged that she had not given Ezell any *Miranda* warnings before asking these questions. She testified that she was more concerned at that point about everybody's safety, given the history of the residence; she wanted to make sure there was nothing in the house that was going to harm anybody. In training, she had been instructed to expect everybody to have a handgun and, if a handgun was found, to expect to find more handguns.

Volk had no further conversation with Ezell. He was transported down to central to talk to detectives. The officers at the scene went back inside the house and found the guns.

Omaha Police Officer Daniel Martin testified that he is currently a homicide detective. On February 25, 2009, he was advised that Ezell had been arrested for stealing Neumeier's vehicle. Detective Martin did not take part in the search, but interviewed Ezell at central

-4-

police headquarters. Detective Dawn Chizek was present during the interview, which was recorded. Detective Chizek read Ezell his *Miranda* rights using a rights advisory form. Ezell stated he was not willing to talk to the officers without the presence of an attorney, so the interview stopped.

On approximately April 17, 2009, Detective Martin interviewed one Matthew Birney at Douglas County Corrections regarding the theft of some projectors. Birney told Martin he did not know the projector was stolen and that he received it from Jeremiah Ezell. Martin subsequently asked the corrections officers if he could speak to Ezell, who was incarcerated at Douglas County Corrections for the February 25, 2009 incident. Detective Martin testified that he did not know for sure whether Ezell had an attorney for that case.

On April 21, 2009, Ezell was brought down to the attorney/clergy interview room at Detective Martin's request. Martin told Ezell he was needed to be interviewed regarding the stolen projector. Ezell said that was fine. Martin testified he then gave Ezell his *Miranda* warnings from memory, and Ezell advised that he wanted to talk to Martin. According to Detective Martin, Ezell understood that he had the right to an attorney but did not indicate that he actually had an attorney at that time.

Martin did not tell Ezell he wanted to talk to him about the incident on February 25, 2009. He did tell Ezell that Matthew Birney said he had received the projector from Ezell. Ezell began talking about the projector and where he got it. According to Detective Martin,

it was a lengthy conversation about methamphetamine and how his life had been affected by methamphetamine.

During that conversation Ezell said he could not believe he "didn't do anything stupid with those guns I had that day." Martin asked Ezell what he was talking about. Ezell replied that it was an open and shut case, that he went into that person's garage, that he stole that car, and he stole those guns. When Ezell began talking about the February 25, 2009 incident, Martin advised him that his *Miranda* rights still applied, but did not repeat the *Miranda* warnings. Martin testified he did not recall whether he reminded Ezell about his requesting counsel back on February 25 and asking whether he still wanted counsel on April 21. Ezell appeared to understand that his *Miranda* rights still applied, he did not ask for a lawyer, and he did not ever ask to end the interview. Martin testified he did not make any promises or threaten Ezell in any way in exchange for a statement. Martin talked to Ezell for about an hour about the February 25, 2009 incident.

At the direction or request of Sergeant Shear, Martin also obtained a buccal swab from Ezell for DNA analysis, as the police had not taken a swab from Ezell on February 25, 2009. When Martin asked Ezell if he would give a swab for his DNA, Ezell reportedly stated, "yeah, I'll submit to one, but it's an open and shut case." The swab was taken by someone from the crime lab in Martin's presence. Ezell did not resist or object, and the officers exited the interview room after they were finished. Detective Martin did not have any further contact with Ezell after April 21, 2009.

## II. LAW

### A. Events of February 25, 2009

The protections of *Miranda v. Arizona*, 384 U.S. 436 (1966), are triggered when an individual is (1) in custody and (2) being interrogated. *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992). 'Interrogation' is 'express questioning,' or words or actions 'that the police should know are reasonably likely to elicit an incriminating response....' *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Lawrence*, 952 F.2d at 1036...." *United States v. Hatten*, 68 F.3d 257, 261-62 (8th Cir. 1995), *cert. denied*, 516 U.S. 1150 (1996) (parallel citations omitted).

The parties agree that Ezell was in custody when Sergeant Volk asked him whether there was anything in the house that could harm anybody or get them in trouble and whether there was a bunch of dope in the house. The parties also appear to agree that these questions constituted "interrogation," and the court finds that Sergeant Volk should have known the questions were reasonably likely to elicit an incriminating response.

Compliance with *Miranda* may be excused under the "public safety" exception announced in *New York v. Quarles*, 467 U.S. 649 (1984). The public safety exception is a "narrow exception" to the *Miranda* rule, *see id.* at 658, and has been applied by the Eight Circuit as follows:

> Under the public safety exception, a suspect's answer may be admitted into evidence if it was obtained in response to a question asked in furtherance of public safety and not designed solely to solicit testimonial evidence, even if *Miranda* warnings had not yet been given. *Quarles*, 467 U.S. at 655-56; *see*

-7-

> *United States v. Williams*, 181 F.3d 945, 954 n.13 (8th Cir. 1999). The exception does not depend upon the questioning officers' subjective motivation. Rather, it is judged under an objective standard and "applies when 'police officers ask questions reasonably prompted by a concern for the public safety.'" [*United States v. Liddell*, 517 F.3d 1007, 1009 (8th Cir.), *cert. denied*, 129 S. Ct. 627 (2008)] (quoting *Quarles*, 467 U.S. at 656). The public to be protected can include the officers themselves. *Id.* (citing *Quarles*, 467 U.S. at 658 n.7, 659).

*United States v. Everman*, 528 F.3d 570, 572 (8th Cir. 2008), *cert. denied*, 129 S.Ct. 998 (2009) (parallel citations omitted); *see also United States v. Watters*, 572 F.3d 479, 482 (8th Cir. 2009).

In this case, the police did not know whether the handgun found in the truck was the weapon referenced by Mr. Neumeier; however, Neumeier had identified defendant Ezell as the person who stole his truck. The police had been called to this residence several times for domestic disturbances and did not want to let the occupants back inside until they were satisfied it was safe to do so. Under the circumstances, the court finds that the officers had an objectively reasonable concern for the public safety such that "spontaneity rather than adherence to a police manual [wa]s necessarily the order of the day." *Quarles*, 467 U.S. at 656; *United States v. Williams*, 181 F.3d 945, 953-54 & n.13 (8th Cir. 1999). Volk began by asking Ezell a general question, i.e., whether there was anything in the house that could harm anybody or get them in trouble. The court finds that Sergeant Volk's questions were not designed solely to solicit testimonial evidence, were reasonably prompted by a concern for the public safety, and are admissible under the public safety exception.

### B. Events of April 21, 2009

Ezell contends, with merit, that his statements to Detective Martin on April 21, 2009 should be suppressed pursuant to *Edwards v. Arizona*, 451 U.S. 477 (1981). In *Edwards*, the Court held that law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation.[1] The Court reasoned that a suspect who requests an attorney, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-485.

"[T]he Fifth Amendment protection of *Edwards* is not terminated or suspended by consultation with counsel." *Minnick v. Mississippi*, 498 U.S. 146, 150 (1990). "A single consultation with an attorney does not remove the suspect from persistent attempts by officials to persuade him to waive his rights, or from the coercive pressures that accompany custody and that may increase as custody is prolonged." *Minnick*, 498 U.S. at 153.

The Supreme Court has interpreted the *Edwards* rule to bar police-initiated interrogation unless the accused has counsel with him at the time of questioning. "When

---

[1] A suspect must clearly and unambiguously request a lawyer in order to trigger his Fifth Amendment right to counsel. *Davis v. United States*, 512 U.S. 452, 462 (1994). Although this point does not appear to be contested, the court finds that Ezell clearly and unambiguously requested a lawyer when first interviewed by Detective Martin at central police headquarters on February 25, 2009.

counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." *Minnick*, 498 U.S. at 153.

> The *Edwards* rule is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights[.]"  It does this by presuming his postassertion statements to be involuntary, "even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." .... This prophylactic rule thus "protect[s] a suspect's voluntary choice not to speak outside his lawyer's presence.

*Montejo v. Louisiana*, 129 S. Ct. 2079, 2085-86 (2009).

Thus, for almost 30 years, the *Edwards* rule has served the purpose of "providing 'clear and unequivocal' guidelines to the law enforcement profession.... [T]here is nothing ambiguous about the requirement that after a person in custody has expressed his desire to deal with the police only through counsel, he 'is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'" *Arizona v. Roberson*, 486 U.S. 675, 682 (1988) (quoting *Edwards*, 451 U.S. at 484-485).

The Fifth Amendment right against self-incrimination "is protected by the prophylaxis of having an attorney present to counteract the inherent pressures of custodial interrogation, which arise from the fact of such interrogation and exist regardless of the number of crimes under investigation or whether those crimes have resulted in formal charges." *Roberson*, 486 U.S. at 685.  The *Roberson* Court specifically rejected the State's contention that "fresh sets

of *Miranda* warnings will 'reassure' a suspect who has been denied the counsel he has clearly requested that his rights have remained untrammeled." *Roberson*, 486 U.S. at 686.

In *Roberson*, the Court "attach[ed] no significance to the fact that the officer who conducted the second interrogation did not know that respondent had made a request for counsel." *Id.* at 687.

> In addition to the fact that *Edwards* focuses on the state of mind of the suspect and not of the police, custodial interrogation must be conducted pursuant to established procedures, and those procedures in turn must enable an officer who proposes to initiate an interrogation to determine whether the suspect has previously requested counsel. In this case respondent's request had been properly memorialized in a written report but the officer who conducted the interrogation simply failed to examine that report. Whether a contemplated reinterrogation concerns the same or a different offense, or whether the same or different law enforcement authorities are involved in the second investigation, the same need to determine whether the suspect has requested counsel exists. The police department's failure to honor that request cannot be justified by the lack of diligence of a particular officer....

*Roberson*, 486 U.S. at 687-88 (parallel citations omitted).

The contact between Detective Martin and defendant Ezell on April 21, 2009 was initiated by Detective Martin, the same officer who had witnessed Ezell's unambiguous request for counsel on February 25, 2009. While the Fifth Amendment right to counsel does not continue *ad infinitum*, it does continue throughout the duration of police custody. There is no evidence that Ezell had been released from custody between February 25 and April 21, 2009. *Cf. United States v. Arrington*, 215 F.3d 855, 856-57 (8th Cir. 2000) (Arrington was no longer "in custody" for purposes of applying *Edwards* and *Roberson* after he was transferred from police custody to correctional custody to serve his sentence). It does not

-11-

matter that Detective Martin approached Ezell in conjunction with an investigation unrelated to the events of February 25, 2009, whether Detective Martin knew or did not know if Ezell had an attorney on April 21, or even whether Ezell had an attorney. The relevant fact is that the officer knew the suspect had previously requested counsel and did not honor that request on April 21, 2009. For this reason, I will recommend that the motion to suppress be granted as to all statements and evidence obtained as a result of the April 21, 2009 interrogation.

### III. RECOMMENDATION

For the reasons discussed above,

**IT IS RECOMMENDED** that defendant's Motion to Suppress (Doc. 19) be denied as to the defendant's statements of February 25, 2009 and granted in all other respects.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) business days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED August 26, 2009.**

> **BY THE COURT:**
>
> **s/ F.A. Gossett**
> **United States Magistrate Judge**